[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10308

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 25, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 07-20563-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FABIAN BERNAL-BENITEZ,
FREDY VILLAFUERTE,
JESUS CERVANTES-GUZMAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 25, 2010)

Before TJOFLAT, BLACK  and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

On July 10, 2007, FBI agents arrested Fabian Bernal-Benitez ("Bernal"), Mario Miguel Santibanez-Antunez ("Santibanez"), Fredy Villafuerte, and Jesus Cervantes-Guzman ("Cervantes") for attempting to buy cocaine from an FBI informant in Miami. On August 30, 2007, a Southern District of Florida grand jury returned a five-count indictment against the four arrestees. Count 1 charged all four with violating 21 U.S.C. § 846 by conspiring to possess cocaine from July 9, 2007, to July 10, 2007, with the intent to distribute. Count 2 charged them with attempting to possess cocaine with the intent to distribute on July 10, 2007, in violation of 21 U.S.C. § 846.[1] Counts 3, 4, and 5 charged Bernal, Santibanez, and Cervantes, respectively, with an immigration violation.[2] Bernal, Santibanez, and Cervantes each pled guilty to his respective immigration violation, but all four men proceeded to trial before a jury on Counts 1 and 2. The jury found Bernal, Villafuerte, and Cervantes guilty on both counts. The jury was unable to reach a

---

[1] Possession with intent to distribute cocaine is proscribed by 21 U.S.C. § 841(a).

[2] Specifically, Counts 3, 4, and 5 charged each defendant with illegally reentering the United States after having been previously removed from the country, in violation of 8 U.S.C. § 1326(a).

verdict in Santibanez's case, and the court, having reserved ruling on Santibanez's motion for judgment of acquittal, granted the motion.[3]

Bernal, Villafuerte, and Cervantes now appeal their convictions. Villafuerte and Cervantes also appeal their sentences. We begin our discussion of these appeals by setting out the facts a reasonable jury could have found from the evidence, and then address the arguments appellants have presented.

## I.

Appellants and Santibanez were arrested as they were in the process of purchasing three kilograms of cocaine from a paid FBI informant, Carlos Mejia. Mejia had dealt large quantities of cocaine in the 1980s and 1990s, but began working for the FBI as an informant after other drug traffickers kidnaped him and took his money.

On June 26, 2007, Mejia spoke on the phone with a person in Mexico going by the nickname "el Primo." El Primo offered to give Mejia the phone number of a person in the United States who wanted to buy cocaine; the next day, he gave Mejia the phone number for a person going by the name "Jose." Mejia called Jose that day, and the two arranged to meet in Miami to discuss a cocaine deal. On

---

[3] Santibanez's conviction on Count 4 remained, however, and the court sentenced Santibanez to "time served" in pretrial and trial detention.

June 29, Mejia met Jose in North Miami Beach at an Arby's restaurant. Jose said that he was interested in buying between twenty and twenty-five kilograms of cocaine, but that he needed to go to Fort Lauderdale to get the money. Jose called Mejia on July 4 and indicated that he was going to send someone to pick up the cocaine the next day, but no one ever appeared.

Jose called Mejia once more on July 9, indicating again that several people were interested in meeting with Mejia to buy cocaine. Jose told Mejia to expect a call from someone identifying himself as calling on behalf of "Camaleon." Fifteen minutes later, Bernal called Mejia, introduced himself as "Adrian, on behalf of Camaleon," and said he wanted to buy three kilograms of cocaine. The two arranged to meet the next day. Mejia and Bernal spoke several times on July 10 to identify each others' vehicles and for Mejia to give Bernal directions to the meeting place, which was a Taco Bell parking lot in North Miami Beach.

Mejia discussed the proposed drug deal with the FBI agent handling him and a sting operation was set up. FBI agents gave Mejia one kilogram of real cocaine and two kilograms of sham cocaine, placed an audio recording device on his keychain, and established a perimeter around the Taco Bell parking lot.

The appellants and Santibanez met Mejia in the Taco Bell parking lot in the evening of July 10. They arrived in a black Jeep Cherokee and parked next to

4

Mejia's Nissan Pathfinder. Santibanez drove, Bernal sat in the front passenger seat, Cervantes sat in the rear driver-side seat, and Villafuerte sat in the rear passenger-side seat. When they arrived, Bernal and Mejia got out and met between the two vehicles. Seconds later, Santibanez got out and joined them.

Bernal told Mejia that he had brought $35,000 for two kilograms of cocaine. When Mejia said he thought the deal was for three kilograms, Bernal responded that they would take two kilograms then and come back for two more later. The three men then went to the front passenger side of the Cherokee where Mejia was shown a bag full of money in the front seat and spoke a prearranged phrase to tell the listening FBI agents that the defendants had brought the money. As Mejia and Bernal walked back to Mejia's Pathfinder, Cervantes and Villafuerte got out of the back seat of the Cherokee. Mejia showed Bernal the cocaine in the Pathfinder, and the FBI agents closed in and arrested all four men.

The agents found two bags of money in the Jeep Cherokee: a red bag on the front seat contained $35,000, and a yellow bag in the rear passenger-side footwell near where Villafuerte had sat held $19,600. The agents also found several prepaid cell phones in the vehicle. Because they were prepaid phones, the agents could not determine who owned which phone, but the phones' call logs indicated

5

that they had been used to call each other and that Bernal had used one of the phones to call Mejia to set up the deal.

## II.

Appellants challenge their convictions on a variety of grounds. Bernal argues that the evidence was insufficient to convict him on Count 2 and seeks a judgment of acquittal on that count. All appellants seek a new trial on two grounds: (1) two individuals were struck from the venire, and therefore were not seated on the jury, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); and (2) some of the prosecutor's comments to the jury in closing argument were improper and denied the appellants a fair trial. Villafuerte seeks a new trial on the additional ground that the district court erred in denying his pretrial motion to suppress his post-arrest confession to the FBI agents and in admitting the confession into evidence at trial. We consider these challenges in order.

## A.

At the close of the Government's case in chief, Bernal moved the district court pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts 1 and 2. The court denied his motion. He renewed his Rule

29 motion at the close of all the evidence; it too was denied. Bernal now contends that the court erred in denying the motion as to Count 2.

> To sustain a conviction for attempted possession with intent to distribute cocaine, the government must prove beyond a reasonable doubt that the defendant[] (1) acted with the kind of culpability required to possess cocaine knowingly and wilfully and with the intent to distribute it; and (2) engaged in conduct which constitutes a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent.

United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001). Bernal argues that the court should have granted his motion for acquittal on Count 2 because the Government failed to establish via expert testimony that the cocaine he was attempting to possess was actually cocaine. We are not persuaded.

The Government did not have to prove that what Bernal was attempting to possess was in fact cocaine; rather, it only had to prove that Bernal intended to obtain cocaine. See, e.g., United States v. Root, 296 F.3d 1222, 1229 (11th Cir. 2002) (noting that "this Court has affirmed attempt convictions when the defendant could not have achieved the final required act because it would have been impossible to commit the actual crime" and citing cases in which the defendant was convicted for attempt even though sham drugs were used).

In detailing in part I, supra, the facts underlying appellants' convictions, we adhered to the standard for determining whether the evidence presented to the jury

7

was sufficient to withstand Bernal's Rule 29 motion. That is, we viewed the evidence, and the inferences reasonably drawn therefrom, in the light most favorable to the Government, giving the Government the benefit of all credibility choices. United States v. Merrill, 513 F.3d 1293, 1299 (11th Cir. 2008). The facts the evidence yielded well established each of the elements of the Count 2 offense. Bernal's sufficiency-of-the-evidence argument therefore fails.

## B.

## 1.

A magistrate judge empaneled the jury with the consent of the parties. He began the jury selection process by questioning each member of the venire about potential biases, then let counsel for both sides address and question the pool.[4] The judge next entertained challenges for cause. After disposing of the challenges, he went down the list of remaining venire persons one-by-one in numerical order—so the parties could exercise their peremptory challenges—until twelve jurors and two alternates were selected. The defense was initially given collectively ten peremptory challenges and the Government six. At the

---

[4] The four defendants were represented by separate lawyers. Each participated in the voir dire of the jury venire. Two Assistant U.S. Attorneys prosecuted the case for the Government. Both participated in the voir dire, either in questioning the prospective jurors or defending the Government's exercise of peremptory challenges in the face of a Batson objection.

defendants' request, however, the judge increased those totals to fifteen for the defense and nine for the Government.

The defendants presented two <u>Batson</u> objections during the selection process, both now before us. The first objection challenged the Government's peremptory strike of venire person number 9. The defense noted that she "is a black female," and stated that "[s]he gave no comments at all that would rationalize the Government striking her, short of being a black female." The judge held that the defense failed to make out a prima facie case of discrimination and therefore did not require the Government to respond.

The second objection was to the Government's peremptory strike of venire person number 31, a black male. The defense argued that number 31 had said nothing that would warrant striking him and, moreover, was the second African-American the Government had struck. The court then asked the Government for a race-neutral reason for striking number 31. The prosecutor responded that she had already accepted three black venire persons, one of whom the defense had struck, and that she was "looking for a more educated panel. This guy is a cook, a dishwasher, and a security guard. He says whoever calls him, that's who he works for." The judge found number 31's education level to be a race-neutral reason and thus overruled the defendants' objection.

9

2.

"As long ago as Strauder [v. West Virginia, 100 U.S. 303, 25 L. Ed. 664 (1879)] . . . the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror." Batson, 476 U.S. at 87, 106 S. Ct. at 1718. Indeed, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." Id.

The district courts employ a three-step procedure for resolving Batson objections. United States v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001). First, the objecting party must make a prima facie showing that the objected-to peremptory challenge was based on race. If a prima facie case of racial discrimination is made, the striking party must articulate a race-neutral reason for the strike. Finally, if the striking party gives a race-neutral reason, the court must determine whether the objecting party "has carried its burden of proving purposeful discrimination." Id. The objecting party may carry its burden by showing that the striking party's race-neutral reason is a mere pretext for discrimination. See Miller-El v. Dretke, 545 U.S. 231, 247–49, 125 S. Ct. 2317,

10

2329–30, 162 L. Ed. 2d 196 (2005) (analyzing for pretext the prosecution's reasons for striking a prospective juror).

Appellants assert that the prosecutor's proffered race-neutral reason for striking number 31—that he was less educated than the other venire persons and that the Government wanted a more educated panel—fails in light of those the prosecutor accepted, which included a postal worker, a bus driver, and an airport parts mechanic.[5]  In overruling defense counsel's objection to the prosecutor's strike of number 31, the judge stated:

> I think that gentleman is—having listened to him, in my estimation is less educated than probably every other juror here and his employment as a dishwasher and—is different than I think a postal employee or those other employees you indicated.  So in other words, I find it's a race neutral reason.

The judge thus provided a reasoned basis for overruling the Batson objection—namely that that particular venire person's style of communication and demeanor set him apart from those who were working in blue-collar jobs.  We will not disturb on appeal a trial judge's finding of no discrimination in the peremptory

---

[5]  We assume for this discussion that the defendants presented a valid prima facie case of discrimination.  The judge presiding over the jury selection is in a better position than we are to consider the relevant evidence—including the interactions between counsel and the venire during voir dire, counsels' questions and comments, and the venire persons' demeanors—so we defer to the judge's finding of a prima facie case of discrimination.  United States v. Stewart, 65 F.3d 918, 923 (11th Cir. 1995) ("When we review the resolution of a Batson challenge, we give great deference to the district court's finding as to the existence of a prima facie case.").

11

strike of a venire person "'unless it is clearly erroneous or appears to have been guided by improper principles of law.'" Allen-Brown, 243 F.3d at 1297 (quoting United States v. Williams, 936 F.2d 1243, 1246 (11th Cir. 1991)). In this case, we are not convinced that the magistrate judge's factual finding that number 31 was indeed less educated than the others in the venire, which was based in large part on the judge's first-hand observations, is clearly erroneous.

Next, appellants argue that, after concluding that the defense had established a prima facie case of discrimination against number 31, the magistrate judge should have revisited the Batson objection to the prosecutor's strike of number 9. Appellants say this because, according to them, the judge based his conclusion, at least in part, on that strike. Appellants acknowledge that during the colloquy between defense counsel and the magistrate judge concerning the prosecutor's strike of number 31, defense counsel never asked the judge to revisit his ruling on their objection to the strike of number 9. Appellants therefore ask us to consider the judge's failure to revisit the ruling as plain error.[6] To find plain error, we would have to locate precedent that would have informed the magistrate

---

[6] Under plain error review, the error must be plain and must affect the defendant's substantial rights. Even then, we may exercise our discretion to correct the error—by granting the defendant a new trial—only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" United States v. Evans, 478 F.3d 1332, 1338 (11th Cir. 2007) (alteration in original) (quoting United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam)).

12

judge that before ruling on a <u>Batson</u> objection based on race, a trial court has a duty <u>sua</u> <u>sponte</u> to reconsider any ruling it previously may have made on a <u>Batson</u> objection based on the same race.[7] We have been unable to locate such a holding; thus, plain error could not have occurred.

C.

Appellants contend that comments the prosecutors made during closing argument to the jury were improper and denied them a fair trial.[8] They identify seven comments in all. A defendant is denied a fair trial if the prosecutor's remarks were (1) improper and (2) prejudicially affected the defendant's substantial rights. <u>United States v. Eckhardt</u>, 466 F.3d 938, 947 (11th Cir. 2006). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." <u>Id.</u> In assessing whether the remarks were prejudicial, "we must evaluate them in the context of the trial as a whole and assess their probable

---

[7] "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." <u>United States v. Lejarde-Rada</u>, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam).

[8] As indicated in note 3, <u>supra</u>, two Assistant U.S. Attorneys prosecuted the case. They divided the Government's closing argument between them, one delivering the Government's opening argument, the other handling its rebuttal.

13

impact on the jury." United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998).

Appellants claim that seven different statements the prosecutors made in closing argument constituted witness bolstering, burden-of-proof shifting, or improper personal opinion. With the above standard in the forefront, we examine these statements.

1.

Appellants claim that the prosecutors bolstered the testimony of FBI agents on three occasions. The first occurred during the Government's opening argument when the prosecutor rhetorically asked whether two FBI agents with many years of experience would "put their badges on the line." The second occurred during the Government's rebuttal. After characterizing one of the defendant's arguments as essentially "that a whole bunch of people in the government are involved in some kind of big conspiracy to frame an innocent man," the prosecutor said, "Now, why people in the government with years of experience would go to all this trouble to try and frame an illegal Mexican who has no prior drug offenses." The third occurred later in the rebuttal when the prosecutor responded to another defense argument that the FBI agents should not be believed: "But again, nobody has submitted any suggestion as to why agents would have any motivation to fabricate

evidence against some small time." On each occasion, defense counsel objected that the prosecutor was bolstering the Government witnesses.

Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility. United States v. Hands, 184 F.3d 1322, 1334 (11th Cir. 1999). Bolstering occurs when "'the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.'" United States v. Knowles, 66 F.3d 1146, 1161 (11th Cir. 1995) (quoting United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983). A prosecutor's comments can fail this test in two ways: (1) by placing the prestige of the government behind the witness, or (2) by indicating that information not before the jury supports the witness's credibility. Id. The rule against bolstering does not, however, prevent the prosecutor from commenting on a witness's credibility, which can be central to the government's case. United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991).

In objecting to the prosecutor's comments, defense counsel never asked for a mistrial; instead, they implied that a curative instruction would suffice to eliminate the prejudice they sensed.[9] Our task, then, is to determine whether any

---

[9] Counsel objected in the presence of the jury in one word, "bolstering," or two words, "improper bolstering." The court overruled each objection instantaneously. Counsel did not seek a sidebar conference to request a limiting instruction.

of the comments at issue was improper and, if so, whether a reasonable probability exists that, but for the comment, "the outcome of the trial would have been different." Eckhardt, 466 F.3d at 947.

None of the comments appellants cite rose to the level of bolstering. True, the prosecutor asked why the FBI agents would "put their badges on the line," implying that the agents would be risking their careers by lying under oath. Merely acknowledging that adverse legal consequences would flow from lying under oath is a far cry from placing the prestige of the government behind a witness.

Rather, the prosecutors were first pointing out the lack of evidence to support defense arguments that the FBI agents were fabricating their stories and then drawing reasonable inferences from the evidence presented at trial as to why the Government witnesses had no incentive to lie. Moreover, the prosecutors did not do this in a vacuum; throughout the trial, the main defense strategy was to attack and undermine the credibility of the Government's case. It was clearly permissible for the prosecutors to counter this strategy. The challenged remarks were accordingly proper.

2.

Appellants claim that two comments made during the Government's rebuttal improperly shifted the burden of proof onto the defendants. The first was a response to the defense's argument that statements Villafuerte and Cervantes gave the FBI following their arrests should not be believed because the agents, following FBI policy, did not record the statements. The prosecutor said this:

> It's also not your job to decide whether you agree or disagree with the directive from FBI headquarters that agents don't record statements of defendants. You all can have opinions on that, probably most of us in this courtroom have opinions, but there's no space on that verdict form for you to say whether you agree or disagree with that opinion. Your job is to decide whether any articulable reason has been presented to you to doubt the truthfulness of the testimony of the agents.

The second comment came in the prosecutor's response to Cervantes's argument that the jury should not believe the FBI agents' testimony. The comment was, "Nobody has submitted any evidence or argument to suggest to you why federal agents with years of experience and . . . . their jobs on the line would fabricate evidence . . . ." The defendants timely objected to each statement, claiming prosecutorial burden shifting, but were overruled.[10]

As part of its obligation to prove guilt beyond a reasonable doubt, the prosecution may not make comments that would shift the burden of proof to the

---

[10] In objecting, the defense neither requested a curative instruction nor moved the court for a mistrial.

defendant. See United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992). ("[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."). Nor may the prosecution comment on the defendant's failure to testify. United States v. Chirinos, 112 F.3d 1089, 1099 (11th Cir. 1997). The prosecutor may, however, comment "on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence." Hernandez, 145 F.3d at 1439.

We are not persuaded that the prosecutor's comments shifted the burden of proof onto the defendants. Viewed in the context of rebutting defense counsel's credibility attacks on the FBI agents, the first comment was merely a request that the jury closely examine the record for support for counsel's attacks. The second comment likewise directed the jury's attention to the lack of evidence that the FBI agents were lying or fabricating evidence. Cf. Chirinos, 112 F.3d at 1100 ("Rather, we believe the [prosecutor's] argument constitutes a proper comment on appellants' failure to have presented evidence that contradicted the testimony of the government's key witness."). Importantly, both of these comments focused on defense counsel's ability rather than obligation to introduce evidence to support their credibility arguments. Cf. Hernandez, 145 F.3d at 1439 ("[I]t is not improper for a prosecutor to note that the defendant has the same subpoena powers as the

government, 'particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness.'" (quoting United States v. Blackman, 66 F.3d 1572, 1578–79 n.7 (11th Cir. 1995))).

In sum, the challenged comments were proper. Furthermore, following closing argument, the court cured any undue prejudice in its instruction on the Government's burden of proof.

3.

Appellants claim that the prosecutor made two impermissible statements of personal belief during the rebuttal argument. The prosecutor said,

> But I submit to you, as I said before, the informant is being perfectly honest about everything in this case. He hasn't been caught in a lie. Nothing has been suggested about his being untruthful at any point. In fact, if you recall his testimony, he was very careful as to what he could say, what he remembered, what he was not sure and what he simply didn't know.

Moments later, the prosecutor remarked, "The essence of your job is to decide what each of those four defendants was doing at that Taco Bell on July 10th. And I think the evidence is overwhelming that they were all there to buy cocaine."

"During a trial, counsel have a duty to refrain from commenting on their personal views on a defendant's guilt and the evidence." Parker v. Allen, 565 F.3d 1258, 1273 (11th Cir. 2009). But the prosecutor may suggest what the jury should

find from the evidence before it. United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984). "[A]n attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." Id. (quoting United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978)).[11] We evaluate the prosecutor's comments in the context of the full trial and any curative instructions "to determine whether the comments so unfairly affected the trial as to deny the defendant due process." Parker, 565 F.3d at 1273. Because appellants did not object to the statements at issue, we review for plain error the district court's failure to intervene sua sponte and instruct the jury to disregard the statements. We find no error, much less plain error in the court's failure to intervene.

When viewed in context, the prosecutor was simply urging the jury to draw certain conclusions from the evidence rather than interjecting his personal views on the evidence or the defendants' guilt. In the first comment, the prosecutor stated the conclusion he wished the jury to draw—that the confidential informant was credible—and then highlighted the evidence supporting it. The same goes for

_____

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the second comment. After claiming that the evidence was overwhelming that the defendants went to the Taco Bell to buy cocaine, the prosecutor filled several pages of trial transcript walking the jury through the direct and circumstantial evidence supporting that interpretation of events. Thus, the prosecutor was merely stating conclusions that he believed the jury should draw from the evidence presented at trial, which is entirely proper. In any event, it was not plain error for the trial court to permit these statements.

## D.

### 1.

After the arrest in the Taco Bell parking lot, agents took the defendants to the FBI headquarters in Miami Beach and separated them for questioning. Cervantes and Villafauerte[12] did not speak English, so Special Agent Rodney Cortes, who was certified by the FBI as fluent in Spanish, interviewed them in Spanish.[13] Cortes began with Villafuerte. He read Villafuerte his Miranda[14] rights

---

[12] Only Cervantes's and Villafuerte's interrogations are relevant to Villafuerte's challenge to his post-arrest confession. Cervantes's interrogation is relevant only to the extent that it sheds light on Villafuerte's.

[13] According to Cortes's testimony, the FBI had a policy of not recording interviews. Because neither Cervantes nor Villafuerte testified, the only evidence presented regarding the interviews was the agents' testimony, the Miranda forms, and the defendants' written statements.

[14] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

in Spanish and gave him a copy written in Spanish on which to follow along. Cortes testified at trial that although he forgot to have Villafuerte sign the <u>Miranda</u> waiver form, Villafuerte nonetheless orally acknowledged that he understood his <u>Miranda</u> rights. Cortes then left to speak with Cervantes. He read Cervantes his <u>Miranda</u> rights in Spanish and gave him a copy written in Spanish to follow along. Cervantes orally acknowledged that he understood his rights and signed the <u>Miranda</u> form.[15]

Cortes then moved back and forth between the two interview rooms, eventually eliciting statements from both Cervantes and Villafuerte. Cervantes admitted that he went to Miami to buy drugs and had contributed $3,000 to the deal. Cortes wrote a brief statement in English to that effect, read it to Cervantes in Spanish, and had Cervantes sign the English-language statement.[16] Villafuerte initially told the agents he had simply come along for the ride and to help the others drive. When the agents told Villafuerte they did not believe him, he admitted that he had come to buy drugs and had contributed $8,000 to the deal.

---

[15] Cortes testified on cross examination that getting Cervantes to sign his <u>Miranda</u> form did not remind him that Villafuerte still needed to sign his, even though Cortes returned to Villafuerte's interview room shortly after Cervantes signed the form.

[16] The statement in its entirety reads, "I, Jesus Cervantes-Guzman, voluntarily make the following statement: On July 10, 2007 i [sic] traveled to North Miami Beach from DeLand, Florida. i [sic] came to purchase drugs. I put in $3,000 to buy the drugs."

Cortes translated this statement to Special Agent Wiegmann,[17] who wrote it down in English. A third FBI agent, Special Agent Ana Garza-Mejia,[18] entered the room after the questioning and orally translated the written statement to Villafuerte. Villafuerte then signed the English-language statement to indicate that he agreed with it as translated by Garza-Mejia.[19]

Before the trial began, Villafuerte and Cervantes moved to suppress their post-arrest statements, arguing that the Government failed to prove that they knowingly waived their Miranda rights and voluntarily confessed to their involvement in the drug offenses. The district court held a suppression hearing in which Agents Wiegmann and Cortes testified about the defendants' arrests and statements. The defendants cross-examined the agents but did not offer any additional evidence. The district court held that, although the circumstances surrounding the statements—Villafuerte's failure to sign his Miranda form and the fact that both statements were written in English instead of Spanish—were

---

[17] The testimony indicates that the FBI agents were all circulating between the various defendants' interrogation rooms.

[18] There does not appear to be any relation between Special Agent Garza-Mejia and the confidential informant Carlos Mejia.

[19] The statement in its entirety reads, "I, Freddy [sic] Villafuerte, make the following voluntary statement to SA's Scott Wiegmann and Rodney Cortes, FBI. I put $8,000 up of the money to buy cocaine."

troubling, there was no evidence that the FBI agents should not be believed. Accordingly, the district court credited their testimony and denied the motions to suppress.

2.

Villafuerte claims the district court erred in denying his motion and in admitting his statement into evidence at trial.[20] "Determining the admissibility of a postarrest confession requires a two-part inquiry. We first decide whether the law enforcement officers complied with the requirements of Miranda . . . ; if so,

[20] Although Cervantes also moved to suppress his post-arrest statement to the agents, he did not include in the statement of issues and argument sections of his brief a challenge to the district court's denial of his motion to suppress. Cervantes did include in the section of his brief entitled, "Statement Regarding Adoption of Briefs of Other Parties," a statement that "adopt[ed] the issues and arguments raised by co-Appellants as they may relate to him" pursuant to Fed. R. App. P. 28(i). The only issues and arguments his co-appellants made that addressed post-arrest statements to the FBI agents were set out in Villafuerte's brief. Villafuerte challenged the court's failure to suppress, and its decision to admit into evidence, the statement he made to the agents. In advancing that challenge, Villafuerte referred to Cervantes's statement to the agents, but in no way suggested that Cervantes's statement should have been suppressed. In short, in adopting the portion of Villafuerte's brief that challenged the admissibility of Villafuerte's statement, Cervantes did not, via adoption, appeal the district court's denial of his motion to suppress.

We faced a similar "adoption" situation in United States v. Khoury, 901 F.2d 948 (11th Cir. 1990), and concluded, as we do here, that the factual scenario applicable to the adopting appellant's claim was so dissimilar to that portrayed in the adopted brief as to require us to hold that the adopting appellant failed to raise the issue at hand. See id. at 963 n.13 ("Khoury did not challenge the sufficiency of the evidence to support his conviction for aiding and abetting the attempted importation of methaqualone or the Travel Act violation. Although Khoury did adopt the arguments of his co-appellants, the fact-specific nature of an insufficiency claim requires independent briefing if we are to reach the merits. Accordingly, we do not, in this case, apply [co-appellant] West's aiding and abetting insufficiency argument to Khoury as the two performed different roles and the evidence against the two substantially differed, thus making West's argument inapplicable.").

24

we then determine if the confession was voluntary." United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam) (citation omitted). "This Court reviews the denial of a motion to suppress a confession under a mixed standard: findings of fact are reviewed for clear error and the application of law to the facts is reviewed de novo." United States v. Glover, 431 F.3d 744, 747 (11th Cir. 2005) (per curiam). Villafuerte argues both that the Government did not obtain a valid waiver of his Miranda rights and that his confession was coerced. We address these arguments in turn.

a.

Villafuerte first argues that his post-arrest statement was inadmissible under Miranda v. Arizona. Miranda protects a person's Fifth Amendment privilege against self-incrimination by requiring law enforcement authorities to advise a person subject to custodial interrogation of certain rights and to respect the person's invocation of those rights. Moran v. Burbine, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986).[21] A defendant may waive these rights, but only if "the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. The Supreme Court has established a two-part inquiry to determine whether the waiver was freely given:

---

[21] The Government concedes that Villafuerte was subjected to custodial interrogation.

25

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran, 475 U.S. at 421, 106 S. Ct. at 1141 (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979)). The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. Glover, 431 F.3d at 748.

Villafuerte argues that a number of mistakes or irregularities surrounding his confession indicate that he did not freely and knowingly waive his Miranda rights: Villafuerte did not sign the Miranda waiver form presented to him even though the agents had Cervantes sign his shortly after Villafuerte gave his statement; someone wrote on Villafuerte's form "Fredy Villafuerte forgot to sign," but the agents did not know who did that; the times indicated on Villafuerte's and Cervantes's forms were inconsistent; and the interrogation was not recorded because the FBI had a policy of not recording interrogations. Villafuerte also points out that during the suppression hearing the Government acknowledged that the agents made a mistake by not having him sign the Miranda waiver. Villafuerte

26

argues it was error for the district court nonetheless to find the statement admissible based on the agents' unrebutted testimony, claiming that the court was applying a "presumption of correctness" to the procedure the agents employed in conducting the interrogations and therefore to the agents' testimony.

Villafuerte's argument falls short. First, although Villafuerte did not sign the Miranda waiver form, "a number of our decisions[] establish that an arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of [the arrestee's Miranda] rights." United States v. Acosta, 363 F.3d 1141, 1154 (11th Cir. 2004) (citing Supreme Court and Eleventh Circuit cases in support). A signed Miranda waiver is usually strong evidence that the defendant waived his rights, but it is not necessary. See North Carolina v. Butler, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). Thus, failing to obtain a signed Miranda waiver alone is not proof that the defendant did not freely and intelligently waive his rights. Rather, the Miranda waiver form is but one of the pieces of evidence the court considers in determining whether the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his rights.

This brings us to the second reason Villafuerte's argument fails. The district court did not apply a presumption of correctness as Villafuerte claims; instead, it made a factual finding based on the agents' testimony that Villafuerte orally waived his <u>Miranda</u> rights. Because of the nature of Villafuerte's interrogation, much of the court's decision to deny the motion to suppress naturally turned on the agents' credibility. That the defendants were unable to poke holes in or rebut the agents' testimony is one factor the court considered in finding the testimony credible. Given that testimony, it was not clear error for the court to find that Villafuerte freely and knowingly waived his <u>Miranda</u> rights.

b.

Villafuerte also claims that his statement was not voluntary. We consider the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary. <u>Waldrop v. Jones</u>, 77 F.3d 1308, 1316 (11th Cir. 1996). We focus on whether the police overreached, considering factors such as "the '[accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of

food or sleep.'" Id. (alteration in original) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973)).

Villafuerte argues that his statement was not voluntarily given primarily because the agents wrote it down in English, which Villafuerte does not speak.[22] Agent Cortes translated the statement orally into Spanish before Villafuerte signed it, but Villafuerte had no independent means of verifying what was written. Although it seems unusual to have a suspect sign a statement written in a language he cannot read, this situation is not police overreaching as contemplated in Waldrop. The district court implicitly found the agents' account of the interrogation credible, and there is no indication that this finding was clearly erroneous. Villafuerte was questioned shortly after his arrest, the questioning was not particularly long or drawn out, and there is no evidence that the agents intimidated him with threats or force. Accordingly, the court did not err in denying the motion to suppress Villafuerte's statement and admitting the statement into evidence.

III.

---

[22] Villafuerte was not given the opportunity to write a statement himself in Spanish.

Cervantes and Villafuerte also appeal the sentences they received on Counts 1 and 2.[23]  The district court sentenced Cervantes and Villafuerte to concurrent prison terms of 78 months and 72 months, respectively, on those counts.[24]  They seek new sentencing hearings on the ground that the district court, in determining the adjusted offense level for those crimes under the Sentencing Guidelines, erred in denying their requests for minor role reductions under U.S.S.G. § 3B1.2(b).

Section 3B1.2(b) states, "[i]f the defendant was a minor participant in any criminal activity, decrease [the offense level] by 2 levels."  The commentary to this guideline defines a minor participant as someone "who is less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 comment. (n.5).

_____

[23]  The district court scheduled the sentencing hearings for Bernal, Cervantes, Villafuerte, and Santibanez for January 10, 2008.  During his hearing, Villafuerte complained that his presentence investigation report had not been explained to him adequately, so the court continued his sentencing hearing to January 15, 2008.

[24]  Under the Sentencing Guidelines for Counts 1 and 2, the total offense level for Cervantes, Villafuerte (and Bernal) was 28, and their criminal history category was I.  This yielded a sentence range calling for sentences of imprisonment of 78 to 97 months.  Villafuerte requested a departure below this sentence range because, unlike the other defendants, he had not been charged with an immigration offense.  The Government agreed with this request.  The district court agreed as well and sentenced Villafuerte six months below the prescribed sentence range.

The court sentenced Cervantes to a concurrent prison term of 24 months on Count 5, the immigration charge.  The court sentenced Bernal to concurrent prison terms of 78 months on Counts 1 and 2 and 24 months on Count 3, the immigration charge.

Before the district court, Cervantes and Villafuerte argued that they only contributed $3,000 and $8,000, respectively, to the drug buy, that they did not engage in any of the negotiations or planning of the deal, and that they remained in the Jeep Cherokee while Mejia, Bernal, and Santibanez were attempting to consummate the transaction. Consequently, they believed they were entitled to a two-level reduction of their base offense level, 28, under section 3B1.2(b). The court disagreed, finding from the evidence adduced at trial that the drug buy was a joint effort and that each defendant was responsible for the entire quantity of drugs involved. Their argument on appeal essentially mirrors the one they made to the district court.

We review a district court's denial of a role reduction for clear error. United States v. Alvarez-Coria, 447 F.3d 1340, 1343 (11th Cir. 2006). "Two principles guide a district court's consideration: (1) the court must compare the defendant's role in the offense with the relevant conduct attributed to him in calculating his base offense level; and (2) the court may compare the defendant's conduct to that of other participants involved in the offense." Id. The defendant must prove his minor role by a preponderance of the evidence. United States v. Rodriguez De Varon, 175 F.3d 930, 939 (11th Cir. 1999) (en banc). But, "a defendant is not

31

automatically entitled to a minor role adjustment merely because she was somewhat less culpable than the other discernable participants." Id. at 944.

The district court did not clearly err in denying Cervantes's and Villafuerte's requests for a minor role reduction. After reviewing the evidence, the court properly determined that it had the basis for finding that the men were engaged in a joint enterprise and that contributing $3,000 or $8,000 to a $35,000 drug buy was significant involvement. Accordingly, the district court properly compared Cervantes's and Villafuerte's roles with the conduct attributed to them. Finding that their roles matched the attributed conduct, the district court properly denied their minor role reduction requests.[25]

## IV.

For the foregoing reasons, the convictions of Bernal, Cervantes, and Villafuerte, and the sentences of Cervantes and Villafuerte are

AFFIRMED.

---

[25] Cervantes and Villafuerte seem to suggest that the district court was nonetheless required to compare their conduct with that of their co-defendants. The court was under no such obligation:

> First, and most importantly, the district court must measure the defendant's role against the relevant conduct for which she was held accountable at sentencing; we recognize that in many cases this method of analysis will be dispositive. Second, the district court may also measure the defendant's role against the other participants, to the extent that they are discernable, in that relevant conduct.

Rodriguez De Varon, 175 F.3d at 945 (emphasis added).

32