[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11609

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL HANKERSON,
a.k.a. Michael Hankerson,
a.k.a. Michael Cortez Hankerson,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 8:22-cr-00210-TPB-JSS-1

_____

Before ROSENBAUM, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

Michael Hankerson appeals his conviction for possessing a firearm as a felon. He argues that the district court should have suppressed evidence found during a warrantless search of his house and custodial statements that were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). After careful review, we affirm.

## I.

The facts here are largely undisputed. Hankerson lived in a four-bedroom, single-family home which he shared with his mother, Amina Mathis; his girlfriend; and their child. Hankerson and his girlfriend lived in the master bedroom. On May 10, 2022, police officers entered the house without a search warrant, in pursuit of a state fugitive named Lonnie Washington who they believed was staying there. Officers found Washington in a bedroom and arrested him. While clearing the house, officers saw a firearm in plain view in the master bedroom. They used that gun to establish probable cause for a subsequent search warrant, and the second search yielded another gun, gun parts—including a lime green AR-15-style frame, barrel, and buttstock—and ammunition. Based on those items, Hankerson was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

After his arrest, Hankerson was transported to court by FBI Agent Melissa Montoya.  Montoya advised Hankerson of his *Miranda*[1] rights by reading the standard FBI form, which Hankerson did not sign.  Hankerson subsequently agreed to speak to Montoya.  Hankerson told Montoya that he had spraypainted the AR-15-style gun lime green because that was his favorite color.

Hankerson moved to suppress the guns and ammunition, arguing that the initial warrantless search of his home, and the subsequent search predicated on the gun discovered during it, violated the Fourth Amendment.  He also moved to suppress his statements to Montoya,[2] contending that his *Miranda* waiver was invalid and that, even if his waiver were valid, his statements were still tainted because the arrest arose from an illegal search.  The government, in response to the motion, asserted that Mathis gave consent for officers to enter the house to arrest Washington and that Hankerson's *Miranda* waiver was knowing and voluntary.

At the evidentiary hearing, one of the officers, Detective Von Leue, testified to the following facts.  Von Leue was the lead officer working Washington's case.  He had information suggesting that Washington was staying at Hankerson's house.  On the morning of May 10, 2022, officers conducting surveillance watched

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966)

[2] Hankerson did not identify, before the district court or on appeal, exactly what statements he wanted to suppress.  We surmise, however, that he wanted to suppress his admission that he spray-painted the gun his favorite color.

Mathis get in her car and pull out of the driveway, inadvertently leaving a coffee mug on the roof of the car. Because the mug posed a traffic hazard, Von Leue pulled Mathis over and, during their interaction, told her that he was attempting to arrest Washington. Mathis confirmed that Washington had been staying at the house and Von Leue asked for her permission to go in the house and arrest him. Mathis agreed to let the officers go in to arrest Washington and they drove back to the house, where Mathis gave Von Leue her house key. After making several unsuccessful calls for Washington to voluntarily surrender, the officers opened the front door, entered, and conducted a protective sweep of the first floor. During the search, the officers heard a male voice coming through a speaker in the doorbell. That person said he was on the phone with Washington, who was going to come out and surrender. The officers waited a few minutes, but Washington did not appear, so they proceeded upstairs. Once upstairs, the officers again conducted a protective sweep, during which one officer saw a firearm in the open top drawer of a dresser. The officers took the gun out and put it on the bed and continued their search for Washington, who they found in another bedroom and arrested. On cross-examination, Von Leue testified that he was aware, before the search took place, that the state officers investigating Washington believed Washington and Hankerson were in the same gang. Von Leue also knew that the officers had arrest warrants for Washington, but he did not hear any discussion of getting a search warrant for the house. He knew that consent to a search must be given freely and voluntarily, but he did not tell Mathis that she was free

to refuse his request for permission, nor did he offer her a written consent form. Von Leue also testified that he did not recall saying anything to Mathis about breaking the door down.

Mathis testified to the following facts. Washington often visited her home and sometimes stayed overnight, but she did not consider him to be a resident. Her other son, Jacorius, slept in the room Washington was arrested in whenever he was in town. When Von Leue pulled her over on May 10, he showed her a photograph and asked her if she recognized the person in it. She said she did, and Von Leue told her that the person was wanted for murder. Von Leue did not ask Mathis if the person in the picture lived in her house, and Mathis did not remember Von Leue asking if that person was at the house. Mathis drove back to her house, where she saw "a bunch of cars everywhere" and "officers out with guns pointed at the house." Von Leue approached Mathis and asked if she could "give him the keys to unlock the door so he don't have the bust the door down and I have to buy another door." He did not ask her permission to go into the house. Mathis did not think she had any choice and did not think she had the option to say no. But she did not want the police to go into her house.

Mathis testified that, in a separate incident about two years earlier, police had come into her home without a warrant looking for her son and, finding him asleep in bed, shot him with rubber bullets. She also testified that she had another son who was killed by police in 2008. After testifying about these experiences, Mathis said she cooperated with the police on May 10 and that she felt she

*had* to do so.  She testified that she was afraid that if police went into the house to get Washington, they would kill him; that she did not want her privacy invaded on account of somebody else; and that she was afraid she could be jailed if she didn't give Von Leue the key.

At some point after the officers were already inside, Mathis pointed out the window to the front bedroom and told one of the officers that, if Washington was in the house, it would be in that room.  One of the officers told Mathis that they had seen the gun in the bedroom and that they would be getting a warrant to search the rest of the house.  Mathis told the officer that Hankerson's girl-friend, Neary, is licensed to carry a firearm.  She knew that Neary owned a gun but did not know if that was the gun the officers found.

On cross-examination, Mathis testified that Washington seemed to have slept at her house on the night of May 9, but that he did not sleep there every night.  She said that she asked the of-ficers if she could go into the house to get Washington and they said no.  She wanted Washington out of the house, though, be-cause she needed to go to work and the police activity was taking a long time.  Mathis did not want a person suspected of murder in her home, which is why she offered to go in and get him.  She did not, however, give anyone else permission to enter.  When she gave Von Leue her house key, she did so because he said he would break the door down otherwise and because she was afraid she would go to jail if she did not cooperate.  She testified that Von

Leue was the only officer who said anything about breaking the door down and that he was speaking nicely, not aggressively. She stated that, if the officers had shown her a search warrant, she would have opened the door for them—and, in fact, that she had been in that situation before and allowed officers into her home with a warrant. She did not, however, ask Von Leue if he had a search warrant because she did not think she had the right to do so.

The district court questioned Mathis directly, and Mathis again testified that the reason she let the officers in was because Von Leue said he would break down the door, but that she would have let them go in to get Washington anyway because, in her past experience with officers, "they've always lied and got away with it . . . and then I find out that they didn't have the right to do it, but they still did it."

An inspector for the United States Marshals Service, Moises Moldes, also testified. He stated that he saw Von Leue and Mathis pull up to the house after the traffic stop and approached them as Von Leue was getting the keys from Mathis. Moldes thanked Mathis for her cooperation. He spoke to her again after the search, when he returned her keys and thanked her again for cooperating. Moldes testified that Mathis was "amicable, really nice," and that she thanked the officers before heading to her car to go to work.

Agent Montoya testified that, on May 11, 2022, she and Special Agent Kevin Corrigan transported Hankerson to appear before a federal magistrate judge. She read Hankerson his *Miranda* warnings from the FBI's standard Advice of Rights form. Montoya

offered Hankerson the opportunity to sign the form, but he did not do so.  He was handcuffed and shackled in a belly chain and Montoya told him that the pen may be difficult to maneuver, and he replied that "he was good.  He didn't want to sign it."  Montoya testified that she read the *Miranda* warnings word-for-word and at a pace that would have been understandable.  She testified that Hankerson indicated that he understood his rights.  She proceeded to ask him questions on the way the courthouse.  Montoya testified that Corrigan was present when she read Hankerson his rights, and Corrigan signed the Advice of Rights form as a witness.

On cross-examination, Montoya agreed with defense counsel that getting a subject to sign the waiver form is preferable.  She also agreed that she and Corrigan left the jail at 9:02 a.m., that she started reading the Advice of Rights at 9:06 a.m., and that her and Corrigan's signatures appeared to be signed at 9:07 a.m., but that she did not know what time Corrigan actually signed it because he was driving the car at the time.  She did not recall what exact words she used to ask Hankerson if he understood his rights, but she usually says "Do you understand," or "Does that sound good," or "Do you have questions."  Montoya did not ask Hankerson how far he had gone in school or whether he can read and write.  Defense counsel introduced Montoya's report and she confirmed that she wrote that "due to Hankerson's hands being situated in handcuffs, he did not sign the FD-395 [Advice of Rights form], but indicated he understood his rights and wanted to speak to an interviewing agent."  Montoya explained that Hankerson indicated his willingness to be interviewed "by continuing to speak with us."  She

agreed that she had written nothing in her report about Hankerson saying "I'm good" as a way of declining to sign the waiver. Montoya testified that, after advising Hankerson of his rights, they went to McDonald's and got him breakfast, which he ate by bending his head down to his hands, still cuffed and tethered to the belly chain.

Finally, Corrigan testified that he was driving the car while Montoya administered Hankerson's *Miranda* warnings. He heard Montoya read the warnings verbatim from the Advice of Rights form and testified that her pace could be easily understood. Corrigan said that Hankerson indicated that he understood his rights and that, when Montoya asked if he wanted to sign the form, Hankerson responded "Nah, I'm good." Corrigan then heard Montoya interview Hankerson. On cross-examination, Corrigan testified that Hankerson's decision to continue speaking to Montoya, after hearing his rights and refusing the opportunity to sign the form, seemed to him to be a knowing and intelligent waiver.

After the conclusion of testimony, Hankerson argued that, under our caselaw, there is "no such thing as inferred consent" and that acquiescence to authority cannot be considered valid consent for a search. As to the statements, he maintained that the tight timeline, minimal discussion, and lack of a signed waiver did not constitute a knowing, voluntary, and intelligent waiver of rights.

The district court ruled on the *Miranda* issue from the bench, denying that part of the motion to suppress. As for the search, the district court ordered supplemental briefing on the "gray area" of

consent being given after an amicable reference to breaking down the door.

In the supplemental briefing, Hankerson maintained that a show of force from armed officers was coercive, such that Mathis's purported consent did not allow for the warrantless search. He argued that Mathis testified that she believed she had no choice, that she was not told she had the right to refuse, and that the consent exception to the warrant requirement, therefore, did not apply. The government, on the other hand, argued that the totality of the circumstances supported a finding of voluntary consent. It argued that Von Leue did not threaten any police action against Mathis, Mathis voluntarily drove back to the house with him, Mathis was never in custody, and Mathis expressed a desire to cooperate and to have Washington removed from her house. The government also contended that Mathis's subjective belief that she had to consent was not relevant to the analysis.

The district court then issued a written order denying the motion to suppress. In its order, the district court found that both Von Leue's and Mathis's testimony was "generally credible" and concluded that the warrantless search was permissible because Mathis, a resident of the home, consented to the officers' entry. It also found that a truthful and non-threatening statement from Von Leue—that he might have to break the door down—did not amount to duress. The district court explained its reasoning as follows:

> Perhaps most importantly, it does not appear that Detective Von Leue's "threat" had any real impact on Ms. Mathis.  Based on the testimony at the evidentiary hearing, it appears that Ms. Mathis wanted Washington out of her home first and foremost, telling the officers what room they would locate Washington in and even offering to go in and get him herself.

Accordingly, the district court denied the motion to suppress the evidence discovered through the second search warrant.    As for the statements, the district court memorialized its earlier finding that Montoya properly issued the *Miranda* warnings and Hankerson knowingly and voluntarily waived his rights.

Hankerson proceeded to a stipulated bench trial, after which he was adjudicated guilty and sentenced to 72 months' imprisonment and 36 months' supervised release.  This appeal timely followed.

## II.

We review a district court's denial of a motion to suppress as a mixed question of law and fact. *United States v. Braddy*, 11 F.4th 1298, 1307 (11th Cir. 2021).  We review the district court's findings of fact—including whether consent was voluntary—for clear error. *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984).  We review the district court's application of the law to those facts *de novo*.  *Braddy*, 11 F.4th at 1307.  We are "not restricted to the evidence presented at the suppression hearing, and instead consider

the whole record." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

## III.

The Fourth Amendment forbids unreasonable searches. *See* U.S. Const. amend. IV. Because the "Fourth Amendment draws a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 583 (1980), a law enforcement officer generally may not enter the home of a third-party to make an arrest without a search warrant for the home, *Steagald v. United States*, 451 U.S. 204, 220 (1981). A warrantless search is reasonable, however, if law enforcement obtains voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). A resident of a jointly occupied premises may consent to a warrantless search of the property. *Fernandez v. California*, 571 U.S. 292, 299–300 (2014).

The government has the burden to prove that consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id.* at 548–49. "'The notion of 'voluntariness,' Mr. Justice Frankfurter once wrote, 'is itself an amphibian.'" *Schneckloth*, 412 U.S. at 224 (quoting *Culombe v. Connecticut*, 376 U.S. 568, 604–05 (1961)). It is only by "analyzing all the circumstances of an individual consent" that we can determine "whether in fact it was voluntary or coerced." *Schneckloth*, 412 U.S. at 233. Relevant factors include (1) whether the person giving consent was under arrest; (2) "the presence of coercive police procedure"; (3) the extent of the person's

cooperation with the police; (4) the person's awareness of her right to refuse consent; (5) the person's education and intelligence; and (6) the person's "belief that no incriminating evidence will be found." *Chemaly*, 741 F.2d at 1352 (quoting *United States v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir. 1981)).

Here, the district court did not clearly err in finding that Mathis freely and voluntarily allowed the home to be searched for wanted fugitive Lonnie Washington. The first, third, fifth, and sixth *Chemaly* factors suggest that consent was voluntary. Mathis was not under arrest at any time before or during the search. She was cooperating with police: she returned to the house with Detective Von Leue and discussed the matter with him amicably. She is a competent state-licensed nursing assistant, suggesting she is both educated and intelligent. And there is no suggestion in the record that Mathis believed that the search would lead to evidence incriminating either her or her son. *See Chemaly*, 741 F.2d at 1352. The second and fourth factors, on the other hand, suggest that consent was not voluntary. Mathis was pulled over by one officer and, when she returned to her home, she was met by armed officers surrounding her house and telling her that her door might be broken down.[3] Von Leue testified that he did not inform Mathis she had the right to refuse the search and Mathis testified that she

---

[3] The parties disagree about whether an officer threatened that Mathis's door would be broken down if she did not agree to the search. For purposes of resolving the case on appeal, we assume, as the district court did, that the statement was made.

believed she could not say no to the officers. *See id.* On balance, more *Chemaly* factors favor a finding of voluntary consent than not. We conclude, therefore, that the district court did not clearly err in determining that Mathis voluntarily consented to the search.

We are compelled to so conclude based on our binding precedent where we have held that an officer's threat to damage property does not invalidate a subject's subsequent consent. *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989). In *Long*, the defendant gave consent to a search of his property but argued that he did so "only because the officers alluded that the grand jury had enough information on which to base his arrest and because the officers threatened that, if necessary, they would return and 'dig the place up.'" *Id.* at 404. Long argued on appeal that the officers' threat to "dig the place up" was coercive, rendering his consent to search the house involuntary. *Id.* We rejected that argument and held that Long had voluntarily consented to the search and had been free, in the alternative, to require the officers to obtain a search warrant. *Id.* at 405; *see also United States v. Garcia*, 890 F.2d 355, 361 (11th Cir. 1989) (consent was still voluntary after officers had told defendant that, if he did not consent to search, they would apply for warrant).

Just as in *Long*, Mathis's consent to search the house was not vitiated by an officer's statement that searching the house without consent would result in damage to her property. *See* 866 F.2d at 404–05. Mathis was "free to force the agents to obtain a search warrant and, if at that time, [she] did not want [her door broken

down], [Mathis] could have cooperated." *See id.* at 405. We agree with the district court that, under our current law, the search was lawful pursuant to Mathis's voluntary consent.

Hankerson also argues for the first time on appeal that, if Mathis consented to any search, the officers exceeded the scope of her consent by entering or continuing to search the house after becoming aware that Washington was willing to come out to be arrested. When an issue is raised for the first time on appeal, our review is for plain error. *United States v. Laines*, 69 F.4th 1221, 1229 (11th Cir. 2023). Our plain-error standard requires that there be error, that the error be plain, and that the error affect a substantial right. *Id.* An error is "plain" if "it is 'obvious' or 'clear under current law.'" *Id.* (quoting *United States v. Candelario*, 240 F.3d 1200, 1309 (11th Cir. 2001)). Hankerson cites no case law in support of his view that Mathis's consent was somehow withdrawn when Hankerson told the officers that Washington was willing to come out, so he has abandoned the argument. *See Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.") But in any event, the testimony elicited at the hearing was that the officers paused their search on the first floor to wait for Washington to make good on his offer to surrender, only continuing upstairs after Washington failed to emerge. It is certainly not plain or obvious, then, that the officers exceeded the scope of Mathis's consent by continuing their search for Washington.

Accordingly, we affirm as to this issue.

## IV.

Under *Miranda*, statements and evidence obtained from custodial interrogation are inadmissible unless the defendant was warned of his rights and knowingly waived those rights. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010). The government bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, voluntary, and intelligent. *Id.* We consider a *Miranda* waiver under the totality of the circumstances, including the details of the interrogation and the defendant's characteristics. *United States v. Ransfer*, 749 F.3d 914, 935 (2014). The totality of the circumstances must reveal an uncoerced choice and a requisite level of comprehension. *Bernal-Benitez*, 594 F.3d at 1318. Signing of a *Miranda* form is not necessary for waiver and not signing does not itself constitute an invocation of the arrestee's *Miranda* rights. *Id.* at 1319.

Here, Hankerson was in custody at the time that he was asked questions, so *Miranda* applies, and the government must show a valid waiver. *See Bernal-Benitez*, 594 F.3d at 1318. Two FBI agents testified that Hankerson's *Miranda* rights were read to him—verbatim and at a comprehensible pace—and that, while he did not sign a waiver form, he indicated that he understood his rights. That he did not sign a form expressly waiving his rights is not dispositive. *See id.* at 1319. There is nothing in the record to suggest that Hankerson did not understand his rights, did not voluntarily speak to officers, was coerced into talking, or lacked the

23-11609                Opinion of the Court                17

intelligence to waive his rights. *See id.* at 1318; *Miranda*, 384 U.S. at 444; *Ransfer*, 749 F.3d at 935. Based on the totality of the circumstances, we hold that the district court did not err in finding that Hankerson knowingly, voluntarily, and intelligently waived his *Miranda* rights after being properly advised.

**AFFIRMED.**