[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10093
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2010
JOHN LEY
CLERK

D.C. Docket No. 4:09-cr-00021-RH-WCS-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TODD WARTHEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(August 6, 2010)

Before CARNES, HULL and MARCUS, Circuit Judges.

PER CURIAM:

After pleading guilty, Defendant Todd Warthen appeals his 21-month

sentence for conspiracy to commit fraud in connection with counterfeit access

devices and fraud in connection with counterfeit access devices, in violation of 18 U.S.C. §§ 371, 1029(a)(1), (b)(2), and (c) and 2.  After review, we affirm.

## I.  BACKGROUND

### A.  Offense Conduct

Defendant Warthen and four codefendants were involved in a scheme to use counterfeit credit and debit cards.  The counterfeit cards were made using account information from a 2008 data breach at Heartland Payment Systems, Inc., a credit card company.  The individuals who perpetrated the breach sold the information to buyers who used it to create counterfeit cards.

In Warthen's case, one of his codefendants used a machine resembling a magnetic stripe reader/writer to create counterfeit Visa gift cards, which the codefendants then used to purchase Wal-Mart gift cards.  Using the Wal-Mart gift cards, the codefendants bought electronics and resold them for a profit.

Codefendant Jeremy Frazier organized the scheme and admitted providing the counterfeit credit and gift cards.  Frazier stated that Defendant Warthen and the other three codefendants took orders for specific items and shopped for them at Wal-Mart, giving Frazier a 25% cut from the sales.

Investigators obtained Wal-Mart surveillance videos showing Defendant Warthen and his codefendants making numerous purchases of Wal-Mart gift cards

with what appeared to be Visa gift cards. They then purchased items such as iPods, X-Boxes, Sony Play Stations and flat screen televisions.

## B.    Presentence Investigation Report

Codefendant Frazier's overall conspiracy involved $320,640.80 in attempted losses. However, in calculating Defendant Warthen's advisory guidelines range, the Presentence Investigation Report ("PSI") held Warthen accountable for only $45,744.06 in losses based on the transactions Warthen completed himself or that Warthen participated in. An appendix to the PSI listed: (1) each of Warthen's transactions by date, card number and victim bank; (2) who, if anyone, accompanied Warthen; (3) whether the attempt was successful (in which case the loss was also calculated as restitution) or unsuccessful; and (4) the amount of intended loss.[1]

The PSI set Warthen's base offense level at 6, pursuant to U.S.S.G. § 2B1.1(a)(2), and then increased it by 6 levels, pursuant to § 2B1.1(b)(1)(D), because the loss was more than $30,000. The PSI applied a 2-level increase,

---

[1] The loss amount under § 2B1.1(b)(1) is the greater of the intended loss and the actual loss. U.S.S.G. § 2B1.1 cmt. n.3(A). Intended loss is defined as "the pecuniary harm that was intended to result from the offense" even if it "would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). The PSI used the intended loss amount of $45,744.06 rather than the actual loss amount of $16,434.98. The PSI arrived at the $45,744.06 amount using a minimum of $500 for each transaction. See U.S.S.G. § 2B1.1 cmt. n.3(F)(i) (providing that in cases involving counterfeit and unauthorized access devices, loss "shall not be less than $500 per access device").

3

pursuant to § 2B1.1(b)(10)(A)(i) and (B)(i), because the offenses involved the possession or use of device-making equipment (the "encoder" used to make the counterfeit cards) and the production of an unauthorized or counterfeit access device (the "debit/credit/gift cards"). The PSI added 2 levels, pursuant to § 2B1.1(b)(2), because the offenses involved at least ten victims, and 2 levels, pursuant to § 2B1.1(b)(9), because the offenses used sophisticated means and were perpetrated in multiple jurisdictions to evade law enforcement (Wal-Marts throughout Florida). With a total offense level of 18 and a criminal history category of I, the PSI recommended an advisory guidelines range of 27 to 33 months' imprisonment.

Warthen objected to the PSI's (1) loss calculation, arguing that he participated in only two transactions, and (2) the sophisticated-means enhancement. Warthen also contended he should receive a 4-level minimal-role reduction and a 2-level reduction for acceptance of responsibility.

## C.    Sentencing Hearing

At the sentencing hearing, the government's witness was Emily Beyer, a special agent with the U.S. Secret Service, who investigated the counterfeit card scheme. Agent Beyer gathered transactional data, journal records and Wal-Mart's video surveillance to identify each codefendant engaged in individual transactions

at the register. Using this information, Agent Beyer created a spreadsheet detailing each codefendant's participation.

As to Defendant Warthen, Agent Beyer listed only those transactions for which surveillance videotapes showed Warthen conducting the transaction or assisting in conducting the transaction. The probation office used Agent Beyer's spreadsheet to prepare Warthen's PSI and the appendix listing the transactions for which he was accountable. Agent Beyer stated that Warthen's role in the scheme was to use the counterfeit credit cards and the Wal-Mart gift cards to buy merchandise and that she had no evidence that he was involved in obtaining the stolen account information, wiring money or selling the Wal-Mart merchandise. Rather, codefendant Frazier purchased the stolen account numbers and possessed the magnetic stripe machine used to encode the stolen account numbers on the counterfeit cards.

The district court overruled Warthen's objections to the sophisticated means enhancement and the loss calculation. As to the loss calculation, the district court found that Agent Beyer's methodology for attributing losses to each defendant was appropriate. The district court found that each defendant was held accountable for only those transactions for which video surveillance demonstrated the defendant's presence. The district court also overruled the objection to the

sophisticated means enhancement.

The district court denied Warthen's request for the minimal-role reduction. Noting that the proper focus was on the defendant's role in the transactions for which he was held accountable, not the entire scheme, the district court concluded that "the person who is there and participates in the transaction does not have a minor role in that transaction." The district court granted Warthen's request for a 2-level reduction for acceptance of responsibility.

With a total offense level of 16 and a criminal history category of I, Warthen's advisory guidelines range was 21 to 27 months' imprisonment. The district court imposed a 21-month sentence. Warthen filed this appeal.

## II. DISCUSSION

On appeal, Warthen argues that the district court clearly erred in denying his request for a 4-level minimal-role reduction, pursuant to U.S.S.G. § 3B1.2. Although the Sentencing Guidelines are advisory after United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), the district court must still correctly calculate the advisory guidelines range. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). The guidelines provide for a reduction of 2 to 4 offense levels based on the defendant's mitigating role in the offense. U.S.S.G. § 3B1.2. A defendant who is a "minor participant" in the criminal activity is entitled to a 2-level

reduction. U.S.S.G. § 3B1.2(b). A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5. A defendant who is a "minimal participant" in the criminal activity is entitled to a 4-level reduction. U.S.S.G. § 3B1.2(a). A minimal participant is one who is "plainly among the least culpable . . . of a group." U.S.S.G. § 3B1.2 cmt. n.4. The defendant has the burden to establish his role in the offense by a preponderance of the evidence. United States v. De Varon, 175 F.3d 930, 939 (11th Cir. 1999) (en banc).[2]

"Two principles guide the district court's consideration: (1) the court must compare the defendant's role in the offense with the relevant conduct attributed to him in calculating his base offense level; and (2) the court may compare the defendant's conduct to that of other participants involved in the offense." United States v. Alvarez-Coria, 447 F.3d 1340, 1343 (11th Cir. 2006). When the relevant conduct attributed to a defendant is the same as his actual conduct, "he cannot prove that he is entitled to a minor-role adjustment simply by pointing to some broader scheme for which he was not held accountable." Id.; see also De Varon, 175 F.3d at 942-43 (concluding that "when a drug courier's relevant conduct is

---

[2]We review a district court's denial of a mitigating-role reduction for clear error. United States v. Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir.), cert. denied, 130 S. Ct. 2123 (2010).

limited to [his] own act of importation, a district court may legitimately conclude that the courier played an important or essential role in the importation of those drugs"). "Relevant conduct" includes the defendant's own acts and omissions and, in the case of a jointly undertaken criminal activity, the reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1).

As to the second prong, the district court is permitted to "measure the defendant's conduct against that of other participants" but only "where the record evidence is sufficient." De Varon, 175 F.3d at 934. Furthermore, "[t]he fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." Id. at 944.

On the record before us, we cannot say the district court's refusal to give Warthen a 4-level minimal-role reduction was clear error. In calculating Warthen's offense level, the district court held Warthen accountable for the losses connected only to the Wal-Mart transactions he actually engaged in. Warthen was not held accountable for Frazier's overall scheme or in his codefendants' transactions in which he played no part.

Warthen points out that, as relevant conduct, he was held accountable for

8

his codefendant Frazier's possession and use of the magnetic stripe machine to encode the counterfeit Visa credit cards. This enhancement added 2 levels to the 12-level offense level calculated based solely on his own conduct. See U.S.S.G. § 2B1.1(b)(10)(A)(i).[3] Warthen however ignores the fact that he himself used the encoded Visa credit cards to purchase the Wal-Mart gift cards, which connects his criminal conduct to some extent to that machine. Even assuming Warthen's actual conduct and his relevant conduct may not be identical, they are inextricably tied together. This is also not a case in which the relevant conduct is much broader than the actual conduct. Warthen has not carried his burden to show he was "plainly among the least culpable" with regard to the counterfeiting scheme.

This is particularly true when we compare Defendant Warthen's role in the transactions attributed to him to that of his codefendants. Although Warthen may have been less culpable than Frazier, who organized the scheme and provided him with the encoded counterfeit Visa gift cards, Warthen was as culpable as the other codefendants, who engaged in the same conduct he did, accompanied him to Wal-

---

[3]We reject Warthen's argument that his loss calculation of $45,744.06 under U.S.S.G. § 2B1.1(b)(1)(D) included loss amounts beyond his actual conduct. The Commentary to § 2B1.1 provides that "[i]n a case involving any counterfeit access device . . ., loss includes any unauthorized charges made with the counterfeit access device . . . and shall not be less than $500 per access device." U.S.S.G. § 2B1.1 cmt. n.3(F)(i). Thus, the PSI's use of the $500 minimum for each Visa gift card transaction Warthen made at Wal-Mart reflected Warthen's actual conduct, not the conduct of his codefendants imputed to him as relevant conduct.

Mart and participated in the counterfeit gift card transactions.

We also agree with the district court that Warthen did not play a mitigating role in his own Wal-Mart transactions. Although Warthen personally did not use the magnetic stripe machine to produce the counterfeit cards, he used those encoded cards in his own transactions. Warthen played an important, rather than minimal, role in those transactions.

Warthen also complains that the district court did not reach the second prong of the De Varon analysis and compare his conduct with that of his codefendants. Nothing in De Varon requires the district court to reach the second prong of the analysis. See De Varon, 175 F.3d at 934. Indeed, De Varon recognizes that "in many cases" the first prong "will be dispositive." Id. at 945. In any event, "[i]n making the ultimate determination of the defendant's role in the offense, the sentencing judge has no duty to make any specific subsidiary factual findings." Id. at 939. Rather, "[s]o long as the district court's decision is supported by the record and the court clearly resolves any disputed factual issues, a simple statement of the district court's conclusion is sufficient." Id. Here, the district court clearly stated that Warthen's role in the offense did not warrant a mitigating-role reduction, and we agree.

**AFFIRMED.**