[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11890
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cr-00086-RWS-ECS-12

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM ESPINOZA,
a.k.a. Cheberria,
a.k.a. El Crazy,

Defendant-Appellant,

REMBERTO ARGUETA,
a.k.a. Pitufo,

Defendant-Appellant.
_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(December 28, 2015)

Before HULL, ROSENBAUM and JILL PRYOR, Circuit Judges.

PER CURIAM:

William Espinoza and Remberto Argueta appeal their convictions and sentences following a joint trial in which a jury convicted them of various charges stemming from their involvement with the La Mara Salvatrucha gang ("MS-13"). After careful consideration of the briefs and the record, and for the reasons below, we affirm.

## I.    BACKGROUND

### A.    Course of Proceedings

Espinoza, Argueta, and 24 other defendants were indicted by a federal grand jury for their conduct associated with MS-13. According to the indictment, MS-13 is one of the largest street gangs in the United States, with about 10,000 members. The indictment alleged that members of MS-13 have committed various criminal acts, including murder, robbery, illegal possession of firearms, and assault. In many instances, MS-13 members allegedly committed these acts in order to maintain or increase their position in the gang.

Along with their codefendants, Espinoza and Argueta were indicted in Count 1 for allegedly violating the conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Count 1 named Espinoza in three overt acts in furtherance of the conspiracy and Argueta in two.

2

Some of these overt acts also served as the basis for specific crimes Espinoza and Argueta allegedly committed while in the gang.

Counts 22 through 25 applied to Espinoza.  The indictment alleged that Espinoza used a gun in an attempted murder on July 20, 2008 and charged him with committing a violent crime in aid of racketeering activities ("VICAR"), in violation of 18 U.S.C. § 1959(a)(5) (Count 22), and using a firearm in relation to this crime of violence, in violation of 18 U.S.C. § 924(c) (Count 23).  The indictment also charged Espinoza with aiding and abetting a VICAR murder on July 22, 2008, in violation of 18 U.S.C. § 1959(a)(1) (Count 24), and aiding and abetting the use of a firearm during this crime of violence, in violation of 18 U.S.C. § 924(c) (Count 25).  Espinoza offered to plead guilty to Counts 1, 22, and 23 but not Counts 24 and 25.  The government rejected this offer.

Counts 16 and 17 applied to Argueta.  Count 16 alleged that on April 13, 2007, Argueta murdered a man, in violation of 18 U.S.C. § 1959(a)(1).  Count 17 alleged that Argueta used a firearm in relation to this crime of violence, in violation of 18 U.S.C. § 924(c).

Before trial, both defendants filed motions to suppress.  Espinoza moved to suppress a gun and ammunition found after a warrantless search of his bedroom.[1]

---

[1] Espinoza also filed a motion to exclude statements he made to law enforcement officers allegedly without first receiving the warnings required under *United States v. Miranda*, 384 U.S. 436 (1966), and another motion to exclude out of court photographic identification evidence,

3

He argued, *inter alia*, that his roommate's consent to search their shared room was insufficient to authorize the search of his personal effects within that room. Argueta's motion to suppress challenged the admission of statements he made to Immigration and Customs Enforcement ("ICE") agents, asserting that the waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), was invalid.[2] The magistrate judge considered evidence, described below in Part II.A, and, after making factual findings, recommended denying both motions. The district court adopted the magistrate judge's recommendations over the defendants' objections.

Both defendants also objected to the admission of two types of evidence. First, they objected to evidence of uncharged gang activity (the "RICO enterprise evidence"), which the government offered to support the RICO conspiracy claim. They argued that their offer to stipulate that the gang was an enterprise for purposes of the RICO conspiracy claim rendered this evidence inadmissible. Second, invoking *Bruton v. United States*, 391 U.S. 123 (1968), the defendants objected to the admission of evidence that their codefendants confessed to certain crimes when those codefendants would not also testify at trial, arguing that the

---

which he argued was a result of an unduly suggestive photo line-up. Espinoza later withdrew the *Miranda*-based motion. The district court denied his motion regarding the photo line-up. Espinoza does not appeal that denial, so we do not address it here.

[2] Argueta also moved to suppress a statement he made in 2008. The district court denied this motion, and Argueta appeals that decision as well. This argument is moot, though, because the government did not present at trial any evidence regarding this 2008 statement.

confessions violated the Confrontation Clause of the Sixth Amendment to the United States Constitution.  The district court overruled these objections.

After a lengthy joint trial, the jury convicted Espinoza of one count of RICO conspiracy, one count of VICAR attempted murder, and one count of use of a firearm in relation to the crime of violence (Counts 1, 22, and 23, respectively). Espinoza was acquitted of the charges in Counts 24 and 25.  At sentencing, Espinoza requested a two-level reduction in his total offense level for acceptance of responsibility under U.S.S.G. § 3E1.1 in the light of his pretrial offer to plead to the charges of which he was acquitted.  The district court denied this request and concluded that the applicable Sentencing Guidelines range was 188 to 235 months. The district court did, however, consider Espinoza's acceptance of responsibility when it addressed the factors set forth in 18 U.S.C. § 3553(a).  The court explained that, because it did not apply the acceptance of responsibility reduction, it would sentence Espinoza at the low end of the guidelines range.  With an additional 60 months tacked on as the statutory minimum for Count 23, the district court sentenced Espinoza to 248 months' imprisonment and five years of supervised release.

The jury convicted Argueta on all three charged counts:  one count of RICO conspiracy (Count 1), one count of VICAR murder (Count 16), and one count of use of a firearm in relation to a crime of violence (Count 17).  For Counts 1 and 16,

5

the district court sentenced Argueta to concurrent terms of life imprisonment, and for Count 17, the court sentenced him to an additional five years' imprisonment to run consecutively. Argueta also was sentenced to five years of supervised release. This appeal followed.

## B.    The Trial

Two types of evidence presented at trial are relevant to this appeal: (1) the RICO enterprise evidence and (2) evidence of specific acts of violence the defendants committed in furtherance of the RICO enterprise.

### 1.    RICO Enterprise Evidence

Four former MS-13 members, Kenedis Bonilla, Jose Delgado, Joseph Diaz, and Gustavo Lopez-Caal, provided testimony supporting the existence of a RICO enterprise including descriptions of drive-by shootings, murders, and aggravated assaults committed by MS-13 members other than the defendants. Bonilla testified about one instance in which he and other members of MS-13, armed with a bat, machete, knives, and a gun, surrounded a rival gang member and hit him in the leg with the machete. According to Bonilla, the MS-13 members chased the victim who ultimately got away. Bonilla also testified that, in December 2006, a fellow gang member was allowed to leave the gang in exchange for committing a drive-by shooting, ending in the death of a rival gang member. Bonilla further testified that

6

he was involved in at least four robberies and a stabbing and shooting of rival gang members.

Delgado, Diaz, and Lopez-Caal provided similar testimony about MS-13 crimes. Delgado testified regarding a number of murders and an attempted murder, including the drive-by shooting Bonilla described and a shooting at a gas station where an MS-13 member known as Pink Panther killed a rival gang member. Diaz described how he drove a member named Lucky to a location where Lucky was killed by other MS-13 members and how he orchestrated a drive-by shooting at an apartment complex. Lopez-Caal, who was an MS-13 member and government informant, testified about the 2007 murder of a rival gang member by another MS-13 member at a night club.

## 2. Specific Acts Attributed to the Defendants

The jury also heard evidence about Espinoza's and Argueta's participation in crimes in furtherance of the MS-13 enterprise. The jury learned of Espinoza's involvement in a nightclub shooting, the basis for Counts 22 and 23, and a murder, the basis for Counts 24 and 25. Only the evidence supporting Counts 22 and 23 is material to this appeal.[3] As regards the nightclub shooting, the government introduced the testimony of Delgado, who confirmed that during a fight at a

---

[3] As regards the murder, the basis for Counts 24 and 25, the government introduced evidence that Espinoza was involved in an armed robbery ending in the death of the victim. Espinoza was acquitted of Counts 24 and 25.

7

nightclub in the summer of 2008, Espinoza shot at a rival gang member, and the testimony of the victim of that shooting, who confirmed that he was jumped by about a dozen MS-13 gang members and shot on the night of July 20, 2008. The government played for the jury video from two surveillance cameras posted outside the nightclub that captured footage of Espinoza retrieving a gun from his car that night.

The government also introduced evidence that Espinoza confessed to the 2008 nightclub shooting. A DeKalb County Police Department detective relayed the substance of a subsequent interview with Espinoza. According to the detective, Espinoza confessed that he shot the victim in the stomach and then fled the scene. Contemporaneous with the detective's testimony, the district court instructed the jury to consider Espinoza's confession only when determining whether Espinoza was guilty of any crime alleged in the indictment, and not in relation to the charges against Argueta. Based on this and other evidence, the jury convicted Espinoza of RICO Conspiracy (Count 1), VICAR attempted murder (Counts 22), and use of a firearm in relation to a crime of violence (Count 23).

The jury also learned of Argueta's involvement in the 2007 murder of a drug dealer in a hotel, the basis for Counts 16 and 17, and an overt act in furtherance of the RICO conspiracy alleged in Count 1. Former MS-13 member Omar Cubillos, who had pled guilty to the murder, testified that Argueta and another gang member

8

named Hidalgo both hid in a hotel room bathroom with two others waiting for the drug dealer to arrive. According to Cubillos, when the drug dealer arrived, Argueta and Hidalgo jumped out of the bathroom brandishing their guns. Cubillos explained that when the MS-13 gang members demanded drugs and money, a gunfight ensued. Cubillos testified that Argueta fired one or two shots before the gun jammed, at which point Argueta threw the gun to Cubillos who fixed and reloaded the weapon and then shot again towards the drug dealer. According to Cubillos, the MS-13 members, including Argueta, then fled the scene. The drug dealer collapsed just outside the hotel room and ultimately died from a gunshot wound to the torso.

Additional evidence the government presented at trial corroborated Cubillos's testimony. Most significantly, an ICE agent testified that Argueta confessed to his involvement in the shooting during a March 23, 2010 interview—the subject of Argueta's unsuccessful motion to suppress. In particular, the ICE agent testified that Argueta admitted he hid in the bathroom with a gun, jumped out when the drug dealer arrived, and shot towards the ground near the drug dealer. The district court contemporaneously instructed the jury to consider this confession only as to the charges against Argueta, and not in any way with regard to the charges against Espinoza.

In addition, two government witnesses described the hotel shooting and confirmed that Argueta was there with a gun. One of the two witnesses also testified that Argueta's gun jammed and he threw it to Cubillos, that the drug dealer was shot and collapsed, and that the MS-13 members all fled the scene. Hotel surveillance footage showed, among other things, Argueta arriving at the hotel with other gang members and fleeing with the group after the shooting.[4]

## II. DISCUSSION

The defendants appeal (1) the denial of their motions to suppress evidence; (2) the admission of the RICO enterprise evidence and their codefendant's confession; and (3) their sentences. Finding no error, we affirm.

### A.    Motions to Suppress

We review the denial of a motion to suppress under a mixed standard, reviewing the district court's findings of fact for clear error and its application of the law to those facts *de novo*, while construing the facts in the light most favorable to the prevailing party below. *United States v. Lewis*, 674 F.3d 1298, 1302 (11th Cir. 2012). A district court's choice between two permissible views of

---

[4] The jury also heard from Christian Escobar, a former member of a rival gang, who testified about a separate act of violence involving Argueta in October 2007. Escobar explained that Argueta confronted him and another man, confirmed that they were members of a rival gang, and pulled out a gun threatening to kill them. According to Escobar, he and the other man tried to use a parked car as a shield to protect themselves from Argueta. Escobar testified that they then ran away while Argueta fired shots toward them. Both men were shot, and Escobar sustained injuries to his back and ribs. This shooting served as an additional overt act in furtherance of the alleged RICO conspiracy in Count 1, of which Argueta was convicted.

the evidence cannot be clear error. *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir. 2006). In conducting our review, "we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit." *Lewis*, 674 F.3d at 1303. We defer to the district court's factual determination "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal quotation marks omitted).

 1. Espinoza's Motion to Suppress

The facts relevant to Espinoza's motion to suppress, derived from the testimony of DeKalb County Detective Adam Tirado, are as follows.[5] Detective Tirado was assigned to investigate the shooting that took place on July 20, 2008 at a local nightclub. He visited the victim of the shooting, Jayro Arango-Sanchez, in the hospital and later at his home. Arango-Sanchez told him that he was shot in the stomach after a physical altercation at the club. At some point during the investigation, Arango-Sanchez told Detective Tirado that Espinoza was the shooter.

After obtaining an arrest warrant, Detective Tirado and several uniformed officers arrived at Espinoza's home. A man named Jose Marvin came to the door and allowed the officers to enter. The officers spotted Espinoza peering out of one

---

[5] Detective Tirado was the only witness to testify at Espinoza's suppression hearing.

11

of the bedrooms and then slinking back into the room to hide. The officers followed Espinoza into the room, promptly arrested and handcuffed him, took him outside, and placed him in a squad car. One police officer stood watch outside the police car while the others remained in the house with Marvin.

Marvin then told the officers he was renting the house and consented to a search. Marvin explained to the detectives that he and Espinoza shared a bedroom. He showed the detectives their shared room, which contained two twin beds against opposite walls, about eight to nine feet apart. Clothing and other articles sat in piles next to each bed. Marvin showed the officers "exactly where he slept and what part of the room he slept in and explained what part of the room Mr. Espinoza slept in." Doc. 571 at 16.[6] Although there was no marked division between the two sides of the room, Marvin "made it clear . . . that they had different sides of the room." *Id.* at 69. The officers searched a pile of clothing stacked in a corner, "in the open," on Espinoza's side of the room. *Id.* at 29. The clothing was sitting on a suitcase or a stack of suitcases. Within the pile of clothing, the officers found a gun and ammunition.

Espinoza moved to suppress the gun and ammunition, arguing that the law enforcement officers erroneously relied on the consent of his roommate, Marvin, to justify the search of his personal property. The magistrate judge disagreed,

---

[6] "Doc" refers to the docket number on the district court docket.

12

concluding that Marvin shared common authority over the bedroom such that he could consent to the search of the room. He further determined that Marvin had authority to consent to a search of the pile of clothes on Espinoza's side of the room, despite evidence that the two men had separate designated sides of the room. And he found that, "[w]hether the clothes were on the floor next to the suitcases or piled in an open suitcase, they were in the open and easily accessible to anyone with access to the room." Doc. 719 at 15. For these reasons, he recommended denying the motion to suppress. The district court adopted the report and recommendation over Espinoza's objection.

On appeal, Espinoza argues that the district court erred in admitting the gun and ammunition found during the warrantless search of his home for two reasons, both of which we reject.[7]

First, Espinoza argues that Marvin lacked the authority to consent to a search of his side of the room. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Ordinarily, the

---

[7] In his post-hearing brief in support of his motion to suppress, Espinoza also argued that the search of his bedroom was unconstitutional because the police removed him from the premises to thwart his ability to object to the search of his bedroom. *See Georgia v. Randolph*, 547 U.S. 103, 121 (2006) (recognizing that an absent co-tenant's objection to a search does not render an otherwise consensual search unconstitutional "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection"). Espinoza does not raise this argument on appeal, and thus we do not consider it.

13

Fourth Amendment requires that police obtain a warrant before entering an individual's home to search for evidence. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). One exception to this requirement is if the individual whose property is searched, or a third-party with common authority over the property, consents to the search. *Id.* "Common authority . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). "[C]ommon authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170.

Marvin had common authority to consent to search his shared bedroom, including Espinoza's designated side of the room. Detective Tirado testified that Marvin answered the door when the officers arrived and informed the officers that he was a renter of the property and that he shared a bedroom with Espinoza. Based on these undisputed facts, the district court did not err in finding that Marvin had "joint access or control for most purposes." *Rodriguez*, 497 U.S. at 181 (internal quotation marks omitted). Although the district court could have found, based upon Detective Tirado's testimony, that Marvin's access or control ended at the imaginary line between the two sides of the room, the district court did not clearly err in finding otherwise. In other words, evidence that the two men had separate,

14

designated sides of the room does not compel a finding in this case that they lacked joint access for most purposes over the entire shared bedroom.

Second, Espinoza argues that Marvin lacked the authority to consent to a search of items in Espinoza's suitcases. Espinoza analogizes this case to those involving a consensual search of shared space leading to a search of a private container in that space. *See United States v. Jaras*, 86 F.3d 383, 389-90 (5th Cir. 1996) (holding that a driver of a car lacked authority to consent to the search of his passenger's suitcase contained in the trunk of the car); *United States v. Salinas-Cano*, 959 F.2d 861, 863-66 (10th Cir. 1992) (holding that a girlfriend lacked the authority to consent to search her boyfriend's closed suitcase found in her apartment). Here, in contrast, although the record was unclear as to whether the clothing in which the gun and ammunition were found was merely piled in a corner by the bed or lying in an open suitcase, Detective Tirado's testimony unequivocally established that the clothing itself was lying in the open. Accordingly, the district court's finding that the police searched clothing lying in the open in a shared bedroom was not clearly erroneous. And thus, the search of the clothing did not exceed the scope of Marvin's authority to consent.

For these reasons, the district court did not err in admitting the gun and ammunition found in Espinoza's home.

15

2.    Argueta's Motion to Suppress

The facts relevant to Argueta's motion to suppress, derived from evidence presented during the suppression hearing, are as follows. In March 2010, Argueta was in state prison on aggravated assault charges to which he had pled guilty. He was released from state custody on March 16, 2010 and sent to an ICE detention facility. Meanwhile, ICE Agent Jason Tyler arranged for Argueta to be brought to an ICE office for interrogation before he was booked into custody on the charges in this case. Questioning the accused before arrest in this way was Tyler's general practice.

As planned, at around midnight on March 23, 2010, Argueta was awakened and transferred to another ICE detention facility in Atlanta for questioning and arrest. He arrived at the ICE facility around 3:00 AM. According to Argueta, he spent the rest of the night shackled by his ankles to another inmate, unable to sleep. He believed that he was on the verge of being deported. He was unaware that he had already been indicted on the charges in this case.

Several hours later, at around 9:00 AM, Agent Tyler and ICE Agent James Ballard arrived to interview Argueta about his involvement with MS-13. Initially, the agents did not tell Argueta why they were interviewing him or that he had been indicted. Agent Tyler maintained that this nondisclosure was not a conscious, strategic decision to withhold information from Argueta. Meanwhile, Argueta

16

continued to believe throughout the interview that he was being questioned on an immigration matter, even though he was asked no questions about immigration.

At the beginning of the interview, Tyler read Argueta his *Miranda* rights in his native language, Spanish, and Argueta signed a waiver in Spanish. Although at the suppression hearing Argueta denied signing the waiver form, he acknowledged that the signature on the waiver looked like his handwriting. According to the agents, Argueta also orally waived his *Miranda* rights. Tyler testified that Argueta appeared to understand the *Miranda* warnings and provided appropriate responses to all questions. Agent Ballard, who is fluent in Spanish, testified that he had no trouble understanding the questions that Tyler asked. The agents made no promises or threats, and Tyler never told Argueta that he would only use his statements in immigration proceedings.

Argueta was then asked about the hotel murder, the basis for Counts 16 and 17, and in response, Argueta made several incriminating statements, which he later testified were untrue. He testified at the suppression hearing that, despite the *Miranda* warnings, he believed he was not free to remain silent. He explained that he had a first grade education and, although he was a native Spanish speaker, he did not read Spanish well.

On appeal, Argueta argues that his *Miranda* waivers were not knowing and voluntary and thus, his resulting statements were inadmissible. "*Miranda* protects

17

a person's Fifth Amendment privilege against self-incrimination by requiring law enforcement authorities to advise a person subject to custodial interrogation of certain rights and to respect the person's invocation of those rights." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010).  A person may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444.  "The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights." *Bernal-Benitez*, 594 F.3d at 1318.  We apply a two-part test to determine whether a *Miranda* waiver was freely given:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted).

In assessing the voluntariness of a statement, we "consider the totality of the circumstances, including the details of the interrogation and the defendant's characteristics." *Bernal-Benitez*, 594 F.3d at 1319. The Court's focus is "on whether the police overreached, considering factors such as the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his

18

constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (alteration in original) (internal quotation marks omitted). "Generally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present." *United States v. Farley*, 607 F.3d 1294, 1329 (11th Cir. 2010).

The district court did not err in denying Argueta's motion to suppress. The testimony introduced at the evidentiary hearing established that Argueta was advised of his rights in his native language both orally and in writing and then waived these rights both orally and in writing. No threats or promises were made and both agents testified that Argueta appeared to understand his rights. Although Argueta denied signing the 2010 waiver and testified that he did not understand his rights, the district court credited the agents' testimony over Argueta's. The district court's choice between two plausible views of the evidence cannot be clear error. *Ndiaye*, 434 F.3d at 1305.

We reject Argueta's argument that the *Miranda* waiver was involuntary or uninformed based on evidence that he was purposefully sleep-deprived, that the ICE agents intentionally withheld that he had been indicted, and that Argueta was uneducated. Although in some cases "slowly mounting fatigue" may be part of an overall scheme to wear down a witness, *see Spano v. New York*, 360 U.S. 315, 322

19

(1959), the district court did not clearly err in finding otherwise here. The record contains no evidence that Argueta was so sleep deprived that he was unable to understand the agents' questions. Further, Argueta cites to no authority that requires interrogating officers to disclose at the outset that an individual is facing an active indictment, and the record contains no evidence that the officers affirmatively attempted to mislead him. *C.f. Farley*, 607 F.3d at 1328-31 (holding that even if authorities trick a witness into thinking that an investigation is about terrorism, rather than a crime for which the witness is a suspect, such trickery does not negate a *Miranda* waiver where there was no evidence the authorities promised to limit questioning to the subject of terrorism or otherwise assured the witness that the statements could not be used against him). Thus, Argueta's erroneous belief that he was being interrogated for immigration purposes, even if resulting from the agents' decision to withhold information about the indictment, does not undermine the otherwise valid *Miranda* waiver. Finally, the record contains no evidence that Argueta's lack of education affected his comprehension. For these reasons, the district court's determination that Argueta voluntarily and knowingly waived his *Miranda* rights was not clearly erroneous.[8]

---

[8] Because there was no error, this Court need not decide whether the admission of the 2010 statement was harmless error, as the government argues.

**B.    Evidentiary objections**

The defendants raise two additional evidentiary challenges.  First, they argue that the district court erred in admitting evidence of uncharged gang activity to support the existence of a RICO enterprise in the light of the defendants' offer to stipulate that MS-13 constitutes a RICO enterprise under the statute.  Second, they argue that, under *Bruton*, 391 U.S. 123 (1968), the admission of their codefendant's confession violated their rights under the Confrontation Clause of the Sixth Amendment because neither codefendant testified at trial.

We generally review a district court's evidentiary rulings for an abuse of discretion and "will reverse only if the resulting error affected the defendant's substantial rights."  *United States v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir. 2002) (internal quotation marks omitted).  *Bruton* claims are based on the district court's evidentiary rulings; we therefore review such claims for an abuse of discretion. *See United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007).

1.    Uncharged Gang Activity

Espinoza and Argueta argue that the district court erroneously admitted the testimony of Bonilla, Delgado, Diaz, and Lopez-Caal, which described crimes committed by other MS-13 members (*see* Part I.B.1), because neither defendant was involved in the gang when those crimes were committed, and neither defendant was aware of the crimes.  They argue that their offer to stipulate that

21

MS-13 was a RICO enterprise, as that term is defined by 18 U.S.C. § 1961(4),[9] rendered this evidence irrelevant, or at least established that the probative value of this evidence was outweighed by a danger of unfair prejudice.  We disagree.

The stipulation offer did not strip the testimony of its relevance for two reasons.  First, the RICO enterprise evidence was relevant not only to whether MS-13 was an enterprise—the limited subject of defendants' stipulation offer—but also to whether defendants' conduct was related to and part of the continued criminal activity of the gang, an additional element of a RICO conspiracy.  *See United States v. Browne*, 505 F.3d 1229, 1257 (11th Cir. 2007); *United States v. Gonzalez*, 921 F.2d 1530, 1545-46 (11th Cir. 1991) ("In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy.").  Thus, even if the government had accepted the offer to stipulate, it could still have relied on the RICO evidence to prove RICO continuity.

Second, generally a party is not required to accept a stipulation and can insist on proving the fact or element of an offense.  *Parr v. United States*, 255 F.2d

---

[9] An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The existence of a RICO enterprise is one element of a RICO conspiracy. *See United States v. Browne*, 505 F.3d 1229, 1257 (11th Cir. 2007).

86, 88 (5th Cir. 1958).[10]  "A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it."  *Old Chief v. United States*, 519 U.S. 172, 189 (1997).  This general rule "is qualified by Rule 403 of the Federal Rules of Evidence."  *United States v. O'Shea*, 724 F.2d 1514, 1516 (11th Cir. 1984).  Thus, we ask not whether the enterprise evidence remained relevant after the offer to stipulate, but whether admitting such evidence violated Rule 403 in the light of the offer to stipulate.  We conclude that it did not.

Under Rule 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  The decision whether to exclude evidence under Rule 403 "is committed to the sound discretion of the trial court, tempered by the particular facts presented."  *O'Shea*, 724 F.2d at 1516 (internal quotation marks omitted).  A party's offer to stipulate is only one factor that the trial court should consider in making a determination under Rule 403.  *Id.*

The admission of the enterprise evidence did not violate Rule 403 because the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice.  The enterprise evidence was highly probative because it

---

[10] Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding on this Court.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

showed not only the type of crimes the MS-13 RICO enterprise was engaged in, providing relevant context for the jury to understand how the enterprise functioned, but, as noted above, also tended to prove that the crimes defendants committed were a continuation of the RICO enterprise. A stipulation would "rob th[is] evidence of much of its fair and legitimate weight." *Parr*, 255 F.2d at 88 (internal quotation marks omitted). And the enterprise evidence, although prejudicial, did not specifically name either defendant. Under these circumstances, we cannot say that the district court abused its discretion when it overruled the defendants' objection to this evidence.

2.    Confessions

Espinoza and Argueta next argue that the district court abused its discretion in allowing the government to introduce their confessions at trial, where neither defendant testified. In particular, Espinoza challenges the admission of Argueta's confession regarding the hotel shooting, and Argueta challenges the admission of Espinoza's confession regarding the nightclub shooting. Relying on *Bruton*, the defendants argue that, although their confessions did not directly implicate each other, the confessions served as proof of overt acts in furtherance of the RICO conspiracy, thus triggering a confrontation right under the Sixth Amendment.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const.

24

amend. VI. "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In *Bruton*, the Supreme Court carved out a "narrow exception" to this principle. *Id.* at 207. There, the Court held that the admission of a codefendant's confession, which on its face inculpated the defendant at their joint trial, violated the Confrontation Clause despite a curative instruction given to the jury. *Bruton*, 391 U.S. at 125-26. The Court concluded that because of the substantial risk that the jury, despite instructions to the contrary, would consider the facially incriminating, extrajudicial statements in determining the defendant's own guilt, admission of such confessions violated the Sixth Amendment. *Id.* at 135.

"Since *Bruton*, the Supreme Court has cautioned against blind application of the *Bruton* rule: 'The Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant.' " *United States v. Arias*, 984 F.2d 1139, 1142 (11th Cir. 1993) (quoting *Parker v. Randolph*, 442 U.S. 62, 73 (1979)). Only those statements by a non-testifying defendant that directly inculpate or powerfully incriminate the codefendant give rise to a constitutional violation. *Id.* No *Bruton* problem exists

25

where the statement "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Marsh*, 481 U.S. at 208.

The district court did not err in admitting Espinoza's and Argueta's statements. Neither defendant's statement directly inculpated, powerfully incriminated—or even mentioned—the other defendant. *Arias*, 984 F.2d at 1142. Here, one defendant's statement incriminated the other only when linked with additional RICO enterprise evidence and specific evidence of the other's role in MS-13. In other words, absent additional evidence linking Espinoza or Argueta to the MS-13 RICO enterprise, the confession of one codefendant had no incriminating effect on the other. Accordingly, in this case, admitting one codefendant's statements as evidence against the other did not violate *Bruton*.

We reject the defendants' argument that because the confessional statements may be proof that a RICO enterprise existed, which is a necessary element of the RICO conspiracy charged against both defendants, the statements trigger a confrontation right under *Bruton*. If the defendants were correct, then any incriminating statement made by one nontestifying coconspirator would be inadmissible against the other, whether or not the statement facially incriminated

26

the other codefendant. *Bruton*'s narrow exception to the general rule of admissibility does not extend this far.[11]

## C.    Sentencing

### 1.    Espinoza:  Acceptance of Responsibility

Espinoza argues that the district court erred in declining to reduce his base offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.  "We review a denial of a reduction of sentence for an acceptance of responsibility for clear error, and that finding is entitled to great deference on review and should not be disturbed unless it is without foundation."  *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009) (internal quotation marks omitted).

Section 3E1.1 provides a two-level reduction in the offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  U.S.SG. § 3E1.1(a).  Generally, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  U.S.S.G. § 3E1.1, comment (n.2).  However, in "rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial."  *Id.*  One example of such a rare situation is where the defendant does not contest

---

[11] Because we hold that no *Bruton* violation occurred, we do not address the government's alternative harmless error argument.

27

the factual basis for his guilt but nonetheless goes to trial "to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct." *Id.*

The district court did not commit clear error in declining to apply the guidelines reduction for acceptance of responsibility. Although Espinoza offered to plead guilty to Counts 1, 22 and 23, he ultimately contested those counts factually by, *inter alia*, challenging the admissibility of evidence in support of those counts. *See supra* Part II.A.1 and note 1. *See United States v. Gonzalez*, 70 F.3d 1236, 1238 (11th Cir. 1995) ("By challenging the admissibility of the essential evidence against him, [the defendant] attempted to avoid a determination of factual guilt and to thereby escape responsibility for his crime."). In this light, Espinoza's plea offer was not by itself a clear demonstration of the acceptance of responsibility. Thus, the district court had sufficient foundation to reject Espinoza's request for a reduction in his base offense level under section 3E1.1.

### 2. Argueta: Life Sentence

Argueta argues for the first time on appeal that his concurrent life sentences violate the Eighth Amendment to the United States Constitution because he did not personally commit the murder for which he was convicted. Ordinarily, an allegation that a sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment raises a legal question subject to *de novo* review. *See*

28

*United States v. Flanders*, 752 F.3d 1317, 1342 (11th Cir. 2014).  "However, when a defendant fails to raise an Eighth Amendment challenge to a sentence in the district court, we review that challenge on appeal for plain error."  *Id.*

"Plain error occurs if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010) (internal quotation marks omitted).  An error is plain if it is clear or obvious.  *United States v. Olano*, 507 U.S. 725, 734 (1993). We have explained that "where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005) (internal quotation marks omitted).

Argueta concedes that no precedent from the Supreme Court or this Court directly resolves the issue he raises.[12]  We agree.  Thus, Argueta cannot show plain error.

---

[12] Argueta adopts the Eighth Amendment argument raised by his codefendant Dimas Alfaro-Granados, who expressly conceded that "from a Supreme Court and Eleventh Circuit [perspective,] the cases do not support his position and that he will have to persuade the United States Supreme Court to reverse itself on these issues for any relief."  Br. of Appellant Alfaro-Granados at 16 n.6, *United States v. Alvarado-Linares, et al.*, No. 13-14994 (11th Cir. Mar. 17, 2014).

29

## III. CONCLUSION

For the reasons explained above, we affirm Espinoza's and Argueta's

convictions and sentences.

**AFFIRMED.**